IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RAMON NUNEZ,<br><br>   Plaintiff,<br><br> v.<br><br>NORTHSHORE UNIVERSITY HEALTHSYSTEM,<br><br>   Defendant. | Case No. 22-cv-01242<br><br>Honorable Jeffrey I. Cummings |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant NorthShore University HealthSystem ("NorthShore" or "Defendant"), submits the following memorandum of law in support of its Motion for Summary Judgment.

## INTRODUCTION

Plaintiff Ramon Nunez ("Nunez") effectively quit his job at NorthShore. He took an approved medical leave in April 2021 and never returned, leading to NorthShore separating his employment 18 months later in November 2022 because he demanded access his retirement account and could only access the funds after his employment ended. Recognizing almost all of his claims turn on whether he suffered an adverse action, Plaintiff insists NorthShore terminated his employment in September 2021. However, the undisputed material facts demonstrate that even after September 2021, Plaintiff recognized he was still a NorthShore employee who was out on leave. Because he remained an employee, he did not suffer an adverse action under the law, which cuts off three of his claims at the knees—race/national origin, disability, and age discrimination. Plaintiff also admits that he was granted and took all the FMLA leave to which he was entitled. Therefore, his FMLA interference claim similarly falls short. Notably, as demonstrated herein, each of these claims are deficient for a number of other reasons as well.

Plaintiff finally claims that NorthShore converted a piece of paper reflecting that he completed a vocational program to become an EEG Technician. But the document is not personal property capable of being converted, and its value would be de minimis even if it were. Plus, NorthShore did not intentionally deprive him of this document, nor did it refuse to return it to him—at most what Plaintiff is actually asserting is that NorthShore was *negligent* in its handling of this certificate, which cannot form the basis of a valid conversion claim.

Accordingly, NorthShore is entitled to summary judgment on each of Plaintiff's claims.

## STATEMENT OF FACTS

Plaintiff began his employment at NorthShore in February 2000 as an EEG Technician (a "Tech") in NorthShore's Neurophysiology Department. (SOF 5.) He had received a certificate from Medical Careers Institute ("MCI"), a vocational training program. (SOF 38.) He reported directly to Sona Zakarian ("Zakarian") from his hire until Zakarian resigned in July 2021. (SOF 5, 24.)

In August 2020, Plaintiff complained to Employee Relations Specialist Alyssa Martin ("Martin") that he felt Zakarian had "harassed" him by micromanaging him during his shifts, exhibited "bullying" behavior, and purposely lost the certificate from MCI that he had gave her in February 2000. (SOF 9–10.) Approximately a week later, on August 26, 2020, Martin received an anonymous email from a purported group of Techs containing similar complaints about Zakarian and a more senior Tech, Elizabeth Bekas ("Bekas") (SOF 12–14.) Plaintiff revealed during his deposition for this case that he was part of the anonymous alleged group of Techs who drafted this email complaint. (SOF 16.)

Martin and her supervisor, Joyce Milewski ("Milewski"), System Assistant Vice President, Employee Relations, investigated the complaints through a series of focus groups. (SOF 18.) The groups contained a variety of individuals in the Neurophysiology Department

2

(except for Bekas and Zakarian) (SOF 19–20.) Through the focus groups—one of which included Plaintiff—Martin and Milewski corroborated some of the allegations about Zakaraian's harsh tone, lack of leadership skills, and scheduling issues. (*Id.*) However, there is no record evidence to show that any of the information provided in Plaintiff's August 2020 complaint to Martin, the "anonymous" complaint, or any of the focus groups included any alleged actions or comments by Zakarian or Bekas related to race, national origin, age, disability, or any other protected classification. (SOF 11, 21.)

In April 2021, Plaintiff contracted COVID-19 and was approved for FMLA leave beginning April 23. (SOF 25.) Plaintiff remained on FMLA leave through July 16, 2021, at which point he had exhausted his FMLA leave. (*Id.*) Danielle Meyer ("Meyer"), his new manager (Zakarian had resigned by this time), informed him on July 28 that he had exhausted his job-protected FMLA leave, and that due the needs of the business, NorthShore planned to recruit to fill his position. (SOF 26.) Meyer further noted that upon his release to work, he should contact her to assist him with returning to a Tech position or with finding another job within NorthShore. (SOF 27.) His leave was ultimately extended through December 31, 2021. (SOF 28.)

In October and November 2021, Plaintiff stayed in contact with Meyer and inquired about his pay during leave. (SOF 31.) While he mentioned that he had heard rumors from his coworkers that he had been terminated, Meyer reassured him that he remained a NorthShore employee, and again reminded him of the process for returning to work once he was medically cleared. (SOF 31–32.) On January 21, 2022, Meyer again reached out to Plaintiff when he failed to return to work and NorthShore had not received notice from its third-party leave administrator that his medical leave had been extended beyond December 31. (SOF 33.) She noted that he was now on an unapproved leave. Notably, Plaintiff's health insurance benefits continued while he

3

was an unpaid leave. (*Id*.) NorthShore allowed him to remain on leave until November 7, 2022, when Plaintiff clearly indicated he had no intention of returning by requesting NorthShore release his retirement funds. (*Id*.) His employment ended effective November 7, 2022. (*Id*.)

Plaintiff, in his communications related to his complaint about Zakarian, and while he was on leave, requested that NorthShore return the MCI certificate he alleges he provided to Zakarian after he was hired. (SOF 10, 38.) The school that issued the certificate had closed, and the Illinois Department of Education was unable to provide him a copy of the certificate when he requested it from them. (SOF 38–39.) However, the Department had provided him with a copy of his transcripts from attending the MCI program. (SOF 39.) On each occasion that he requested the original he allegedly provided upon hire, Martin, Meyer, and others searched NorthShore's files but were unable to locate it. (SOF 40.) Notably, NorthShore hires Techs without this type of certificate—proof of specific training is not necessary for employment as a Tech, and several Techs only have a high school education (SOF 41.)

## ARGUMENT

NorthShore is entitled to judgment as a matter of law here because "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The party moving for summary judgment bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine dispute of material fact. *See id*. at 323. Under Rule 56(a), the burden then shifts to the nonmovant , who "must go beyond the pleadings" to demonstrate that there is evidence "upon which a jury could properly proceed to find a verdict in [their] favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013). "The existence of

a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). And "[c]onclusory statements, not grounded in specific facts" cannot defeat a motion for summary judgment. *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016)

### A. Plaintiff's Race Discrimination Claim Fails As A Matter of Law.

The undisputed factual record shows that NorthShore did not discriminate against Plaintiff based on his race or national origin. In order to successfully establish a claim of race or national discrimination under Title VII, a Plaintiff must show: (1) he is a member of a protected class, (2) he was meeting the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably. *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (internal citations omitted). If the plaintiff meets each element of his prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id*. at 536–37.

Plaintiff claims fall short on two of the four prongs of this standard. No reasonable jury could conclude that Plaintiff suffered an adverse employment action, nor could it show that similarly situated employees were treated more favorably him.

### 1. Plaintiff Has Not Suffered Material Adverse Action.

An "adverse action must materially alter the terms and conditions of employment." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir.2005) (citations and quotations omitted). Examples of adverse employment actions include: "termination or suspension, demotion evidenced by a decrease in wage or salary, denial of a raise or fringe benefits, less

distinguishable title, material loss of benefits, significantly reduced material responsibilities . . . ." *Jones v. City of Chicago*, 673 F. Supp. 3d 926, 938 (N.D. Ill. 2023).

Plaintiff did not suffer a materially adverse action here. Instead, Plaintiff declined to return to work after he exhausted his job-protected FMLA leave on July 15, 2021. (SOF 25.) He was then approved for non-job-protected medical leave from July 16 through December 31, 2021. (*Id.*) He did not return on January 1, 2022, and ultimately remained out on leave for a total of 18 months. (SOF 33, 37.)

Plaintiff attempts to twist this sequence of events into the adverse action he needs to establish a discrimination claim; in other words, he argues NorthShore terminated him in or around September 2021. However, his only evidence is alleged "rumors" he heard from his coworkers. (SOF 31.) But several facts in the record refute that assertion. First, Plaintiff's own contemporaneous communications to NorthShore demonstrate his understanding that he was still employed and simply on medical leave. (SOF 31–33.) For example, in November he inquired why he "[had] not been compensated for [his] leave" for the month of October. (SOF 30.) These are not communications from someone who truly believes his employer had ended his employment. (SOF 34.)

Second, NorthShore was unequivocal concerning his status as an employee in months before and after September 2021. Its recruit-to-fill letter explained that NorthShore would attempt to place him in the same or similar role once he was cleared to return to work. (SOF 26.) Meyer likewise responded to his November 2021 correspondence explaining "you are still an active employee with NorthShore," and attempted to explain the difference between job-protected and non-job-protected leave. (SOF 32.) In January 2022, when he did not return to work as scheduled, Meyer again contacted him about the "status of [his] leave of absence" and explained that he was now on an unapproved leave. (SOF 33.) NorthShore allowed him to

6

remain on leave for almost 18 months, at which point he clearly indicated that he had no desire to return. (SOF 37.) During the entire 18 months, Plaintiff had continued access to his health insurance benefits. (SOF 35–37.)

The undisputed factual record shows that Plaintiff understood that he was not terminated in September 2021, and that NorthShore allowed him to remain on both approved and unapproved leaves. As a result, Plaintiff cannot show he suffered a materially adverse action, and his prima facie case of discrimination fails. *See Menninger v. PPD Dev., L.P.*, No. CV 19-11441-LTS, 2022 WL 3030981, at *8 (D. Mass. Mar. 22, 2022) (finding no adverse action and granting summary judgment for the employer where it left the plaintiff's position open for eight months after she took medical leave and then terminated her employment when she "showed no sign of intending to return to work."). And, to the extent he truly failed to grasp that he was still employed in 2021 and 2022, his subjective belief that he was terminated in September 2021 is insufficient to propel this case past summary judgment. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 548 (7th Cir. 2011) ("If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.")

### 2. There is No Evidence That Other Similarly Situated Employees Were Treated More Favorably.

The record is devoid of any evidence that similarly situated non-Hispanic or non-Honduran employees were treated more favorably than Plaintiff. To the contrary, Plaintiff testified that "just about all" of the other Techs suffered the same alleged mistreatment as Plaintiff. In cases like this where the plaintiff alleges that he suffered disparate treatment, the plaintiff must show that a comparator (1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in misconduct of comparable seriousness. *Coleman v. Donahoe*,

667 F.3d 835, 851–52 (7th Cir.2012). Plaintiff specifically admitted that white and black Techs, as well as be individuals who he believed were from the United States, Russia, and South Africa all suffered the same treatment as him. (SOF 17; see SOF 20) And, in fact, Plaintiff testified that almost of the other Techs conferred and pulled together an anonymous complaint listing the ways in which they believed Zakarian and Bakas mistreated them. (SOF 16–17.) Given that this group included individuals of different races and national origins, Plaintiff cannot show he was singled out based on his race or national origin, and the Court should therefore grant summary judgment in NorthShore's favor on this claim.

### B. Plaintiff's Age Discrimination Claim Likewise Fails at Summary Judgment.

No reasonable fact finder could conclude that Plaintiff suffered discrimination on the basis of his age. To survive summary judgement, a plaintiff must set forth "relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's age . . . ." *McDaniel v. Progress Rail Locomotive, Inc*., 940 F.3d 360, 368 (7th Cir. 2019) (internal quotations and citation omitted). "However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse employment action because of [his] age." *Id*. The ADEA requires age to be the "but-for" cause of the challenged adverse employment action. *Igasaki v. Ill. Dep't of Fin. & Pro. Regul*., 988 F.3d 948, 960 (7th Cir. 2021).

Here, Plaintiff's claim fails in at least two respects. First, as explained *supra* in Section A.1, Plaintiff cannot establish that he suffered an adverse employment action. That alone dooms his claim. *Gurley v. LaHood*, 855 F. Supp. 2d 846, 849 (N.D. Ill. 2012) (granting summary judgment in ADEA case where there was no adverse action). Second, Plaintiff's only evidence of age-related discriminatory animus is a vague assertion of a stray comment he alleges that

Zakarian (a supervisor) or Bekas (a co-worker) may have made that he did not "need the money" at this point in his career "as if [he]were rich . . . ."(SOF 22.)

That is insufficient to survive summary judgment for myriad reasons. First, that comment, if uttered, is ambiguous at best. Plaintiff's own testimony about the comment—i.e., "it's possible [that they were referencing his age]"—(*Id.*) is itself an indication of the ambiguity, and cannot move his claim past summary judgment. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012) (granting summary judgment in an ADEA case where the alleged discriminatory comments were "devoid of any indication that [the defendant's] alleged motivations were age related."). Moreover, this stray comment, even if credited as discriminatory (which it is not), would be insufficient to establish an age discrimination claim. *See, e.g.*, *Roberts v. Columbia Coll. Chicago*, 102 F. Supp. 3d 994, 1005 (N.D. Ill. 2015), *aff'd*, 821 F.3d 855 (7th Cir. 2016) (isolated remarks that older workers did not embody the image the employer wanted to portray were "stray remarks" that could not move claim past summary judgment).

Finally, assuming the comment were deemed discriminatory, NorthShore cannot be liable for the comments of a non-decisionmaker. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) ("[A] nondecisionmaker's animus is not evidence that the employer's actions were on account of the plaintiff's age.). Plaintiff alleges that Zakarian and Bekas made the at-issue comment related to his age. However, Bekas was merely Plaintiff's coworker—not a decisionmaker (SOF 13)—and Zakarian had resigned her employment in July 2021 (SOF 24), prior to when Plaintiff (incorrectly) alleges he was terminated in September 2021. And although Plaintiff has no recollection of when Zakarian made the comment, it could not have been *after* Zakarian resigned in July. In other words, there is no evidence on the record that age was the "but for" reason for his termination, and the court should grant summary judgment on this claim

as well. *Id*. at 604 (7th Cir. 2012) (plaintiff's ADEA claim failed where he could not produce evidence that the alleged age-based comments were connected to the alleged adverse action).

### C. Plaintiff's Disability Discrimination Claim Should Be Dismissed.

To start, Plaintiff's disability discrimination claim against NorthShore should be dismissed because he did not exhaust his administrative remedies prior to filing this lawsuit on that claim. "An ADA plaintiff must file a charge with the EEOC before bringing a court action against an employer." *Riley v. City of Kokomo*, 909 F.3d 182, 189 (7th Cir. 2018) (internal citations omitted). A "plaintiff is barred from raising a claim in the district court that had not been raised in his or her EEOC charge . . . ." *Id.*

In this case, Plaintiff failed to check the "Disability" box on the EEOC charge form and the narrative section of the Charge form is entirely devoid of any mention of an alleged disability or disability discrimination. (SOF 42–43.) It is axiomatic that his failure to include this allegation in his charge ends the inquiry. *See, e.g.*, *Torres v. Alltown Bus Servs., Inc.*, No. 05 C 2435, 2008 WL 4542959, at *3 (N.D. Ill. Apr. 28, 2008) (granting summary judgment for defendant on the plaintiff's race discrimination claim where he "not only failed to check the 'race' box on his charge of discrimination (he checked only the boxes for national origin, age and disability), but he also failed to mention race in his description of the alleged discriminatory conduct.").

Further, his disability claim cannot survive for other reasons as well. First, he cannot establish adverse action. *See supra* in Section A.1. Second, there is nothing in the record to show his disability was the "but for reason for the [alleged] adverse action," *Hoffstead v. Ne. Illinois Reg'l Commuter R.R. Corp.*, No. 21 C 4335, 2023 WL 8353271, at *5 (N.D. Ill. Nov. 21, 2023 (citation omitted). Third, Plaintiff cannot establish he was a qualified individual with a

10

disability because he was unable to return to work long after his FMLA leave expired. *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476 (7th Cir. 2017) *cert den'd* 138 S.Ct. 1441 (2018).

NorthShore is entitled to summary judgment on Plaintiff's ADA claim.

### D. Plaintiff's FMLA Interference Claims Fails By His Own Admission.

Plaintiff's FMLA interference claim similarly falls flat. In his Complaint, he alleges that NorthShore "interfered, restrained, and/denied the exercise of or attempt to exercise" his FMLA Rights. (ECF No. 1 at pp. 8–9.) To prevail on a FMLA interference claim, Plaintiff must establish that (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied her FMLA benefits to which he was entitled. *Guzman v. Brown Cnty.*, 884 F.3d 633, 638 (7th Cir. 2018).

Here, Plaintiff's own allegations in the Complaint end his claim. Plaintiff contends that he was "granted FMLA leave from on or about May 23, 2021 through on or about August 31, 2021." (ECF No. 1 at pp. 8.)[1] In other words, by his own admission, Plaintiff was provided more than 12 weeks of FMLA leave; all the leave to which he was entitled under the FMLA. Courts have concluded that a plaintiff's "FMLA interference claim fails because he received the FMLA leave to which he was entitled." *See, e.g.*, *Ennin v. CNH Indus. Am.*, LLC, 878 F.3d 590, 597 (7th Cir. 2017). Moreover, there is no evidence on the record that comments or actions NorthShore took discouraged or prejudiced Plaintiff in any way from finishing his FMLA leave (and from continuing non-FMLA disability leave after his FMLA leave exhausted). See *Ziccarelli v. Dart*, 35 F.4th 1079, 1089 (7th Cir. 2022) (holding that a plaintiff must show threatening or discouraging comments about leave prejudiced him in some way).

---

[1] In fact, the exact dates of his approved leave were April 23, 2021 through July 15, 2021—or, 12 weeks.

11

As the court in *Lane v. Magellan Health, Inc.* explained, while a plaintiff does not have show that the employer *denied* his FMLA leave to pass summary judgment scrutiny, he must show that any alleged threats or discouragement "caus[ed] [him] to forgo taking FMLA leave." No. 22-CV-28-WMC, 2023 WL 3303897, at *6 (W.D. Wis. May 8, 2023) citing *Ziccarelli*, 35 F.4th at 1090 (7th Cir. 2022)); *Kirchhoff v. Chem Processing, Inc.*, No. 20 C 50242, 2023 WL 157922, at *4 (N.D. Ill. Jan. 11, 2023) (granting summary judgment for defendant where plaintiff could not provide evidence that the alleged "discouraging" comments affected his decision to take leave). Plaintiff exhausted his FMLA leave, which completely undercuts his FMLA interference claim. The Court should grant summary judgment on Count II of the Complaint.

### E. Plaintiff's Conversion Claim is Not Cognizable.

Plaintiff alleges that NorthShore lost a "credential" or "certification" related to his employment as an EEG technician, which he provided to his supervisor upon hire in February 2000. Plaintiff's conversion claim cannot survive summary judgment. "To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Loman v. Freeman*, 229 Ill. 2d 104, 127 (2008) (citation omitted). "As an intentional tort, to support a claim for conversion a plaintiff must show that the defendant intentionally committed the wrongful deprivation." *Hafer v. Chicago Bd. of Educ.*, 2014 IL App (1st) 131149-U, ¶ 22 (citing *Loman v. Freeman,* 229 Ill.2d 104, 129 (2008)).

#### 1. Plaintiff's Certificate is Not Personal Property.

Plaintiff's conversion claim rests on a piece of paper that simply demonstrates that he attended a now-defunct training program. He alleges that the value of the document is that it confers upon him an ability to be employed as a neurophysiology technician. While that is not

12

the case (SOF 41), such a right—i.e., future employment—is not a property right sufficient to sustain a conversion claim because it is intangible. Courts have admittedly held that some documents in which intangible rights may be reflected, such as "promissory notes, bonds, bills of exchange, share certificates and warehouse receipts", are actionable. *The Film & Tape Works, Inc. v. Junetwenty Films, Inc.*, 368 Ill. App. 3d 462, 475–76, 856 N.E.2d 612, 624 (2006). The common thread these documents all share is that "they are tangible documents containing intangible rights which are *easily convertible into tangible assets*, not dissimilar to currency." *Id*. (emphasis added).

The certificate forming the basis of Plaintiff's conversion claim is not a document that reduces intangible rights to writing, which, in turn, are easily convertible to tangible assets. One cannot, for example, convert a contract for services, which "does not embody any intangible right other than a mere expectancy." *Id*. A certificate such as the one Plaintiff alleges NorthShore lost, at best, simply embodies a mere expectancy of a job in the future, in which there is no tangible property interest. *See e.g.*, *In re Marriage of Weinstein*, 128 Ill. App. 3d 234, 244–45, 470 N.E.2d 551, 559 (1984) ("A degree or license is at most a mere expectancy of some future income or earnings. Neither has a present assignable value, as neither can be sold as can other items of an intangible nature such as goodwill of a business nor can either be said to represent a guarantee of receipt of a set amount in the future such as pension benefits."). Consequently, a conversion claim concerning a certificate such as the one at issue here cannot lie.

### 2. The Certificate Itself is De Minimis

Given the discussion above, Plaintiff's conversion claim, then, could only lie with respect to the actual physical certificate he alleges NorthShore converted. But the value for such a certificate is de minimis, and courts do not entertain conversion claims for de minimis items.

*See Arwa Chiropractic, P.C. v. Med-Care Diabetic & Med. Supplies, Inc.*, No. 14 C 5602, 2019 WL 527497, at *8 (N.D. Ill. Feb. 11, 2019), aff'd, 961 F.3d 942 (7th Cir. 2020) (noting that courts treat claims for de minimis damages as "too trivial to support a cause of action."). First, the claimed certificate is not required for all neurophysiology positions. Indeed, NorthShore can and does hire individuals who do not possess a training certificate. (SOF 41.) Second, Plaintiff admitted that the document has a stand-in. (SOF 39.) That is, he could have obtained a copy of it from the school had the school remained operational when he needed it. Because it is not, the state was able to issue him transcripts from the school, which had the same effect as the certificate—it proves he attended the program. (*Id*.) Accordingly, the certificate's value is simply the cost of the ink and the paper it is printed on. This exemplifies a de minimis conversion case. *See, e.g.*, *G.M. Sign, Inc. v. Elm St. Chiropractic, Ltd.*, 871 F. Supp. 2d 763, 769 (N.D. Ill. 2012) (A conversion claim for conversion for lost ink and the piece of paper may be valid, but such loss would be so slight that the de minimis doctrine would bar any recovery and entitle defendant to summary judgment on the claim).

### 3. NorthShore's Actions Were not Intentional

Even if Plaintiff could somehow show that that certificate represented a valid, tangible property interest and had value, his claim would fail because the undisputed record demonstrates that NorthShore did not commit an intentional tort. *See Fujifilm N. Am. Corp. v. D/C Exp. & Domestic Packing, Inc*., 339 F. Supp. 3d 790, 801 (N.D. Ill. 2018) ("Because it is considered an intentional tort under Illinois law, conversion requires "an intentional exercise of dominion or control over a chattel.") NorthShore, at worst, lost the certificate if Plaintiff ever provided it. That cannot subject it to conversion liability. *Id*. ("[I]f the goods have been lost, harmed, or destroyed through the negligence of the person in possession . . . such person may be liable for his negligence, but he is not liable for a conversion[.]") (citations and quotations omitted).

14

Moreover, there is no evidence that NorthShore "refused" to provide it to Plaintiff at his request. *Mark I, Inc. v. R.G. Int'l Corp.*, No. 89 C 7190, 1991 WL 181061, at *2 (N.D. Ill. Sept. 9, 1991) ("[T]here can be no conversion until the possessor refuses to deliver up the property upon demand. The possession originally rightful becomes wrongful when the defendant refuses to return the goods."). In fact, there is no evidence in the record that Plaintiff had a right to the certificate's return after he gave it to NorthShore at the time of his hire. Further, on each occasion that he requested it, someone from NorthShore looked for it but was unable to find it. (SOF 40.) Plaintiff has presented no evidence to show that NorthShore declined to return the document to him; in fact, he acknowledged that it may have been lost (SOF 10.) In other words, Plaintiff's contention boils down to NorthShore was negligent in failing to keep tabs on his certificate. Accordingly, Plaintiff cannot establish the critical element of "intent" necessary for a conversion claim, and his claim fails for this reason as well. *Fujifilm N. Am. Corp.*, 339 F. Supp. 3d at 801 (N.D. Ill. 2018) (granting summary judgment for defendant on a plaintiff's conversion claim where the plaintiff could only demonstrate the defendant failed to properly care for the property he alleges defendant converted).

## CONCLUSION

Based on the Defendant's Statement of Undisputed Materials Facts, and the foregoing authority and arguments, Defendant respectfully requests that the Court grant its Motion for Summary Judgment and dismiss with prejudice Plaintiff's claims in their entirety.

**DATED: April 19, 2024**  Respectfully submitted,

SEYFARTH SHAW LLP

By: /s/ Brandon L. Dixon
Marc R. Jacobs, ARDC No. 6191561
mjacobs@seyfarth.com
Brandon L. Dixon, ARDC No. 6308887
bdixon@seyfarth.com
SEYFARTH SHAW LLP
233 South Wacker Drive
Suite 8000
Chicago, Illinois 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

Attorneys for Defendant

**NORTHSHORE UNIVERSITY HEALTHSYSTEM**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he served a copy of the foregoing Memorandum of Law in Support of Defendant's Motion for Summary Judgement on all counsel of record via the Court's CM/ECF system, on April 19, 2024:

> */s/ Brandon Dixon*
> One of Defendant's Attorneys